Wanamaker, J.,
dissenting, the question. Can a right, acknowledged and guaranteed by the *418 constitution, be withdrawn from such constitutional protection, either by legislative act that destroys that right, or by judicial act that so construes such legislative act as to destroy that right ?
The specific question is the- right to the possession of a weapon in one’s home, however humble, to defend one’s inalienable right of life, liberty, person, property and home. The mere fact that this question is so vital, and involves the rights of so many of our citizens in the above respects, would seem to justify a full statement of the grounds upon which this dissent is based.
origin of human rights. Human rights were born when humanity was born. Both were divine creations. They antedated states, kings, and parliaments. States, constitutions and statutes followed centuries after. The latter were human creations. Their primary and paramount purpose was to conserve those human rights, not to deny or destroy them.
CONFIRMED IN THE DECLARATION OF INDEPENDENCE. More than a century and a half ago our American forefathers, as Englishmen, were seriously suffering from a general disregard of those human rights at the hands of the mother country. In old Independence Hall they unanimously recognized and revered those human rights in one of the opening paragraphs of that immortal American Magna Charta:
“We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that *419 among these are Life, Liberty, and the pursuit of Happiness.”
purpose of government. Then immediately follows the American polestar of government, in those ringing words:
“That to secure these rights, Governments are instituted among Men.”
If these human rights were self-evident to our forefathers a century and a half ago, how comes it that they are doubtful now, or that either legislature or courts may deny them, notwithstanding these guarantees of the sovereign people have been put into our written constitutions?
WRITTEN CONSTITUTIONS PECULIAR TO AMERICA. When the American colonist was transformed into an American citizen he still remembered his bitter experience with the mother country, in the abuse of parliamentary power, a clear violation of his rights as a free man. That parliamentary power was sovereign, absolute, unlimited. Even the last king who had vetoed it had lost his head; and no court had ventured to nullify it by judicial act.
The American idea was to profit from experience of parliamentary abuses, and to place a direct and potential limitation upon parliamentary power, indeed upon every power in the scheme and system of government.
" John Marshall in the celebrated case of Marbury v. Madison, 1 Cranch (5 U. S.), 137, announced this wholesome doctrine, that has been religiously and universally followed, though not always impartially applied:
*420 “Those, then, who controvert the principle that the constitution is to be considered, in court, as a paramount law, are reduced to the necessity of maintaining that courts must close their eyes on the constitution, and see only the law.
“This doctrine would subvert the very foundation of all written constitutions. * * * It .would be giving to the legislature a practical and real omnipotence, with the same breath which professes to restrict their powers within narrow limits. It is prescribing limits, and declaring that those limits may be passed at pleasure.
“That it thus reduces to nothing what we have deemed the greatest improvement on political institutions, a written constitution, would of itself be sufficient, in America, where written constitutions have been viewed with so much reverence, for rejecting the construction.”
The national constitution is throughout a limitation of national power. Indeed that national constitution would never have been adopted, because of the absence of a bill of rights in that document, had it not been for the repeated and overwhelming promise that a bill of rights would be speedily proposed and adopted by the first congress that should assemble under the new constitution; and the first ten amendments came as that bill of rights, one of which was Article X: “The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.”
STATE CONSTITUTIONS LIMITATIONS ON POWER RATHER TPIAN GRANTS OF POWER. Cooley in his *421 great work on constitutional limitations, and the uniform holdings of the courts of last resort of all the states as well, concur in the general doctrine that the state constitutions are very largely limitations upon the various branches of the government, as well as upon all other agencies. It is agreed that, it is in that view that our state constitutions must be construed, because that was the primary idea in departing from the English system and in placing a limitation upon the sovereign political powers. In order that their American government should not disregard human rights, as the English government had disregarded them, the Americans determined upon written constitutions to safeguard and guarantee those rights. Accordingly, our Ohio fathers, both in 1802 and in 1851, adopted as a part of their constitution a bill of rights, which they placed first in order, because those rights were first in importance.
Ohio Constitution of 1851 — ’Article I.
BILL OF RIGHTS.
“Section 1. All men are, by nature, free and independent, and have certain inalienable rights, among which are those of enjoying and defending life and liberty, acquiring, possessing, and protecting property, and seeking and obtaining happiness and safety.
“Section 2. All political power is inherent in the people. Government is instituted for their equal protection and benefit,” etc.
*422 “Section 4. The people have the right to bear arms for their defense and security; * *
This is the language of the plain people of Ohio, put into their own constitution. The people’s meaning is self-evident. It will not do to pervert the natural and ordinary meaning of the people’s words by substituting therefor a judicial construction that negatives and nullifies these constitutional guarantees. The people clearly understood these plain provisions. It is incredible that any court should be ignorant of them, or even doubtful concerning them.
Now necessarily one man’s rights end, where another man’s rights begin; and, therefore, reasonable limitations may be placed so as to not only guarantee what is my own, but likewise protect the other fellow in what is his own. This necessarily opens up a large field of regulation in the public interest, under what is known as the police power — the public need — which is its measure for public health, peace, safety, or welfare.
crimes in oí-no. This brings us to the direct consideration of the jurisdiction of government touching crimes. 12 Cyc., page 129, defines a crime as follows:
“A crime is an act or omission which is prohibited by law as injurious to the public and punished by the state in a proceeding in its own name or in the name of the people or the sovereign.”
On page 130 the same work says:
“A tort or private wrong is ‘an infringement or privation of the civil rights which belong to individuals, considered merely as individuals/ while a *423 crime or public wrong is a ‘breach and violation of the public rights and duties, due to the whole community, considered as a community, in its social aggregate capacity.’ ” (Citing, in notes, 4 Blacky stone, page 5.)
All the definitions by authors and courts clearly and uniformly show that in order to warrant such prohibition of the act denounced as criminal, the act forbidden by law, such act or acts must have some natural or reasonable relation to the public peace, safety, or welfare. It must in short be affected with a public interest, either to the public injury or the public jeopardy.
Otherwise, there is neither right nor reason to legislate publicly against it.
It is uniformly admitted that we must look to the statutes to determine whether or not any given act or acts constitute a crime under the constitution and laws of Ohio. Here we have only statutory crime, and it is uniformly held that all such statutes shall be strictly construed. They are not to be enlarged by implication. Furthermore, all such statutes are clearly limited by the constitution, and especially by the bill of rights thereof. Not only is the legislature in its enactment of the statute so limited by the constitution, particularly its bill of rights, but courts, in construing any such statute, have likewise an equal, yes, a greater, obligation to. be controlled by such constitutional limitations.
The statute in question here, Section 12819, General Code, reads:
“Whoever carries a pistol, bowie knife, dirk, or other dangerous weapon concealed on or about his *424 person shall be fined * * * or imprisoned,” etc..
It will be noted that this section is classified by the legislature, in Chapter 7 of the Crimes Act, under “Offenses against public peace.”
The reasonable inference from such classification of the prohibited act by the legislature is that such act must be one which either clearly violates or clearly menaces “public peace.” The direct pointed question then is in every prosecution under this statute, Does the act complained of under the indictment, and under the evidence offered in support of it, constitute “an offense against public peace?”
THE FACTS IN THIS CASE.
The facts are few, and so far as they are essential are admitted. At' an early morning hour, officers of the law enter a railroad car that is used as a bunkhouse by railroad employes. Said car as such bunkhouse is furnished by the railroad company for the benefit and use of its employes. Said officers find the defendant upon a bunk, dressed, and asleep. They roll him over, and out of his pocket there falls the weapon in question. He is thereupon arrested and charged with “carrying concealed weapons,”' under the section above quoted.
i The court, in substance, charged upon the trial, that if the defendant, while in his own home, had in his possession, that is, on or about his person, a concealed weapon, that he would not be guilty of an offense under the indictment charging “carrying concealed weapons.” The jury acquitted the *425 defendant, and the prosecutor took his exceptions, which are now before this court for review.
In legal effect the court charged that the mere possession of a deadly weapon on one’s person, even though concealed, in one’s own home — in this instance a bunkhouse, where the defendant slept and ate — ■ would not constitute an offense under the constitution and laws of Ohio.
MERE POSSESSION NOT ENOUGH.
Let us examine two other statutes that deal with the possession of certain things that the law recognizes as outlaws:
1. Section 12439, General Code, which prohibits the possession of burglar’s tools with the intent of using such tools burglariously or feloniously, reads:
“Whoever has or keeps in possession tools, implements, or other things used by burglars for house breaking, * * * with the intention of using such tools or implements burglariously, shall be imprisoned.”
2. Of a like character is the statute prohibiting having in possession counterfeit money, Section 13096, General Code:
“Whoever * * * has or keeps in possession or conceals, with the intent to pass, utter, publish or sell, such false, forged, counterfeited or altered stamp, note, * * * shall be fined * * * and imprisoned.”
It will be here noted that in each case the unlawful possession is coupled with a felonious intent, and that both are necessary to constitute a crime under either statute.
*426 THE ACID TEST APPLIED TO THE “CARRYING OF CONCEALED WEAPONS'” STATUTE AS CONSTRUED BY THIS COURT.
Now suppose the legislature in constructing this statute had made it read, “Whoever has or keeps in his possession any concealed weapon,” you would then have a statute like the ones pertaining to burglar tools and to counterfeit money, with this exception, that as to both burglar tools and counterfeit money mere possession is not enough, but must be coupled with the specific criminal intent defined by the statute.
But this supposed language of the legislature in construction of the statute is exactly what this court has construed the statute to mean in the present case; that is, the present case presents no essential facts except the mere possession of a concealed weapon, which, when the defendant was rolled over on his bunk at six o’clock in the morning, fell out of his trousers pocket. There are the cold-blooded facts. That there might have been trouble in the bunkhouse before is immaterial; he was not arrested for any disturbance of the peace; the charge was solely “carrying concealed weapons.”
But the legislature evidently did not intend to use this language “has or keeps in his possession a concealed weapon,” or they would have used it. Men are supposed to use natural and ordinary language, according to its natural and ordinary meaning. They are presumed to mean what they say, and say what they mean.
Why did they use the word “carry” a concealed weapon, instead of “has or keeps in his possession” *427 a concealed weapon ? Simply because the two terms mean entirely different things. To carry a concealed weapon means to bear it, to transport it* to convey it, to be or to move about in a public place whereby the public peace or safety is invaded or endangered. If the legislature had not intended such a distinction they would have said “Whoever has or keeps in his possessionno matter whether it be in a public place or in his private home. I maintain that this is a sane, sound and sensible distinction between the language used as to concealed weapons and the language used as to burglar tools and counterfeit money.
Had the legislature, however, used this language, “Whoever has or keeps in his possession” a concealed weapon, as constituting a crime under the constitution and laws of Ohio, would such a statute be constitutional?
It having clearly appeared that the constitution expressly and repeatedly gave to each citizen the right of defending his life, his person, his liberty, his property, his family and his home, shall it be held that he may not provide the necessary ways and means and the necessary weapons for that defense ? May the constitution give him a right and the legislature then strip him, deprive him of all the ways and means for the exercise of that right, especially in his own home? The mere statement of a contradiction so utterly absurd is its own best answer.
Why should a right be declared by the constitution, by the sovereign people, and then subsequently denied by statute — through a mere agency of the *428 sovereign people, under limited delegated power? Why should a right or a power be granted by the constitution, if a political agency under that constitution may guillotine that same right or power? Had the legislature enacted such a statute, clearly and conclusively it would have been unconstitutional; self-evidently so. Is it any the less offensive to the constitution, is it any the less in violation of that constitution, which this court is sworn to support, to so construe “carrying” concealed weapons as to mean “has or keeps in his possession” concealed weapons, which, if in the form of a statute, would be clearly unconstitutional ? I maintain that there is only one answer to this proposition, and that is a decisive “no.”
As'bearing upon this same question and touching crimes generally, the sovereign people of Ohio wrote in their public will, the Constitution, Section 20 of the judicial Article:
“The style of all process shall be, The State of Ohio’; all prosecutions shall be carried on, in the name, and by the authority, of the state of Ohio; and all indictments shall conclude, ‘against the peace and dignity of the state of Ohio.-' ”
Why?- Because you cannot have a crime unless it be a public crime, an invasion of the public rights, the public peace, and public welfare. And there is not a suggestion anywhere in this record that' there is any such invasion, actual or threatened. How then can the act be against the public peace and dignity of the state of Ohio, which is made essential by constitutional provision?
*429 This case is broader than a bunkhouse. However humble, there is no place like home, and that home is where one has a lawful right to be, whether as landlord or tenant, where he lives, and eats, and sleeps, and which he has a lawful right to protect. It was so before we had constitutions, and it is no less so since we have constitutions; and if one has a right to protect that home he has a lawful right to use any and all means reasonably necessary to accomplish that protection.
It is alleged that under Section 13693 his constitutional right's are fully safeguarded. This I deny. That section reads:
“Upon the trial of an indictment for carrying a concealed weapon, the jury shall acquit' the defendant if it appear that he was at the time engaged in a lawful business, calling or employment, and that the circumstances, in which he was placed, justified a prudent man in carrying such weapon for the defense of his person, property or family.”
This section clearly imposes the burden upon the defendant of proving his right under such a prosecution to the possession of such concealed weapon. He must be subjected to the humiliation of an indictment; he must employ counsel, bear the expense of a trial, and defend as against an act of the legislature as construed by this court, though in the exercise of a right which the constitution clearly and self-evidently, gives him. The doctrine must soúnd strange, that before one can justify the exercise of a constitutional right of defense of person, property or home, it is incumbent upon him to prove to the satisfaction of the court or jury that the *430 circumstances were such as to justify a prudent man in carrying such weapon. It is making a legislative act paramount to a constitutional provision. I do not care to spend any more time on a matter' suggested in the opinion, by drawing a silk line between a bunkhouse and a palace. Both are presumed to be equally under the protection of the constitution.
Thus far in my dissent I have dealt with the legal doctrine declared in the charge, as an independent proposition of law, having a constitutional not a statutory basis, and that, too, without reference to the majority opinion. I desire now to deal specifically with that opinion.
I desire to give some special attention to some of the authorities cited, supreme court decisions from Alabama, Georgia, Arkansas, Kentucky, and one or two inferior court decisions from New York, which are given in support of the doctrines upheld by this court. The southern states have very largely furnished the precedents. It is only necessary to observe that the race issue there has extremely intensified a decisive purpose to entirely disarm the negro, and this policy is evident upon reading the opinions. What may have seemed sufficient reason for a holding concerning the carrying of concealed weapons in one’s own home in those states, does not oblige the supreme court of Ohio to make a similar holding in this state.
Our oaths are to the effect that we shall perform our duty according to the best of our understanding and ability, and not according to the understanding and ability of some other court. But none of the *431 constitutional questions raised in this dissent were raised in the cases from Alabama, Arkansas, Georgia and Kentucky, except the one in Section 4, dealing with “bearing arms.” As to the later cases in those states, it is held that this phrase “bearing arms” is used in a military sense, and that such a weapon as a pistol or a revolver is not a military arm, and therefore not within the protection of the constitutional provision.
I do not care to enter into that controversy, because it is immaterial to this case. I do not base my dissent merely upon the constitutional right to bear arms, but upon the earlier sections of the bill of rights of Ohio, Section 1, Article I, which expressly and explicitly enumerates certain inalienable rights, “among which are those of enjoying and defending life and liberty, acquiring, possessing, and protecting property, and seeking and obtaining happiness and safety.”
And likewise upon Section 2, Article I, where it is stated:
“Government is instituted for their equal protection and benefit.”
But an examination of these cases very largely discloses the fact that the constitutional questions were not raised in them. In the Georgia case cited in the majority opinion, Brown v. State, 114 Ga., 60, the supreme court refused entirely to consider the constitutional question, because it had not been raised in the court below.
Touching this question of bearing arms, an earlier case from Kentucky, in my judgment, weighs *432 more in reason and constitutional sense than all the others quoted in the majority opinion. Furthermore, it is the opinion of the court, and not the opinion of any judge. It is Bliss v. Commonwealth, decided in 1822, found in 2 Litt. (12 Ky.), 90. In that case it was sought to uphold the doctrine that the constitutional guarantee of bearing arms was subject to regulation by the legislature, and that a denial of the right to bear arms “concealed on or about one’s person” was merely such regulation as the constitution allowed. Upon this proposition the court, at page 91, said:
“That the provisions of the act in question do not import an entire destruction of the right of the citizens to bear arms in defense of themselves and the state, will not be controverted by the court; for though the citizens are forbid wearing weapons concealed in the manner described in the act, they may, nevertheless, bear arms in any other admissible form. But to be in conflict with the constitution, it is not essential that the act should contain a prohibition against bearing arms in every possible form; it is the right to bear arms in defense of the citizens and the state, that is secured by the constitution, and whatever restrains the full and complete exercise of that right, though not an entire destruction of it, is forbidden by the explicit language of the constitution.
“If, therefore, the act in question imposes any restraint on the right, immaterial what appellation may be given to the act, whether it be an act regulating the manner of bearing arms or any other, the consequence, in reference to the constitu *433 tion, is precisely the same, and its collision with that instrument equally obvious.
“And can there be entertained a reasonable doubt but the provisions of the act import a restraint on the right of the citizens to bear arms ? The court apprehends not. The right existed at the adoption of the constitution; it had then no limits short of the moral power of the citizens to exercise it, and it in fact consisted in nothing else but in the liberty of the citizens to bear arms. Diminish that liberty, therefore, and you necessarily restrain the right; and such is the diminution and restraint, which the act in question most indisputably imports, by prohibiting the citizens wearing weapons in a manner which was lawful to wear them when the constitution was adopted. In truth, the right of the citizens to bear arms, has been as directly assailed by the provisions of the act, as though they were forbid carrying guns on their shoulders, swords in scabbards, or when in conflict with an enemy, were not allowed the use of bayonets; and if the act be consistent with the constitution, it cannot be incompatible with that instrument for the legislature, by successive enactments, to entirely cut off the exercise of the right of the citizens to bear arms. For, in principle, there is no difference between a law prohibiting the wearing of concealed arms, and a law forbidding the wearing such as are exposed; and if the former be unconstitutional, the latter must be so likewise.”
This sounds like the doctrine of the Thurmans and the Ranneys of Ohio, the Cooleys and Camp- *434 bells of Michigan, and of Chief Justice Marshall, the great constitutional defender of more than a century ago, its original, fundamental, calm, consistent reason justifying and sustaining itself by its inherent sense and convincing logic, not by the citation of the dictum of some other court.
The Kentucky court reasoned rightly that what the constitution has given absolutely and unlimitedly the legislature maj^ not take away, in whole or in part.
The language of the opinion makes too much of the facts touching the reason for the officers coming to the bunkhouse in the early morning. The opinion says:
. “It is apparent from the testimony why these police officers went there on that morning. It was because of a complaint they had received from the cook- of the camp, denied, however, by the accused, that the accused while drunk on the evening before had threatened to kill the cook with the pistol in question.”
This seems like a studied effort to divert legal attention from the only question in this case. The .defendant was not charged with disturbing the peace the evening before; he was not charged with pointing firearms, or making an assault, the evening before. He was charged with carrying concealed weapons the following morning, under the circumstances heretofore related. The issue cannot thus be diverted.
Again, the opinion is more significant for what it does not say, than for what it does say. It no.where deals with the fundamental proposition that *435 any criminal act, statutory or otherwise, must bear; some reasonable relation to the public peace, public safety, public health, public morals, public welfare. If these are in no wise invaded by the alleged criminal act, either actually or by. menace, no crime is committed.
Mark the language of the indictment in its essential parts:
“Unlawfully and feloniously carried on or about his person, a certain dangerous weapon, to-wit, a revolver, contrary to the peace and dignity of the State of Ohio.”
The indictment itself suggests the idea that it is the peace of the state that must be violated, and yet the opinion entirely ignores this element of every criminal act.
Again, the opinion of the court entirely ignores Sections 1 and 2, Article I of the Bill of Rights, before quoted. It does quote at some length an opinion from the supreme court of Alabama, Dunston v. State, in which no constitutional question was raised, and in which the language quoted from the supreme court does recognize the public relation necessary to the criminal act by the qualification made in these words, “may tend to the insecurity of other persons.”
Of course, opinions can be found in support of almost any doctrine if you will look long enough ,and far enough. Opinions never were wanting to support witchcraft and slavery.
Again, the opinion nowhere undertakes to draw a distinction between the statute involved in this case and the statutes relating to having in posses *436 sion burglar tools and counterfeit money with felonious intent, in both of which the criminal intent is necessary to constitute the crime. Here the only criminal act was the mere possession in one’s pocket, in one’s home, of a concealed weapon.
I hold that the laws of the state of Ohio should be so applied and so interpreted as to favor the law-abiding rather than the law-violating people. If this decision shall stand as the law of Ohio, a very large percentage of the good people of Ohio to-day are criminals, because they are daily committing criminal acts by having these weapons in their own homes for tjieir own defense. The only safe course for them to pursue, instead of having the weapon concealed on or about their person, or under their pillow at night, is to hang the revolver on the wall and to put below it a large placard with these words inscribed:
“The Ohio supreme court having decided that it is a crime to carry a concealed weapon on one’s person in one’s home, even in one’s bed or bunk, this weapon is hung upon the wall that you may see it, and before you commit any burglary or assault, please, Mr. Burglar, hand me my gun.”